**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| CAREY JONES | Case No. <u>1:26-cv-00410</u> |
| Plaintiff, | **COMPLAINT** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| SWEEPSTEAKS LIMITED, d/b/a Stake.us, | |
| Defendant, | |

Plaintiff Carey Jones hereby alleges against Defendant Sweepsteaks Limited, d/b/a Stake.us ("Stake" or "Defendant"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.    BACKGROUND

1.    Stake owns and operates a popular, casino-oriented internet gaming website called www.stake.us.

2.    Gambling is heavily regulated and mostly outlawed in Ohio. *See* Ohio Rev. Code Ann § 2915.01, *et seq*.

3.    Yet Stake is accessible and operational in Ohio without receiving proper licenses, registrations, and approvals. Nor is Stake listed as an approved sweepstakes provider in Ohio.

4.    Stake does not operate to promote or market another product or service; Stake is the product or service.

5.    Stake operates indefinitely and not for a fixed period of time.

6.    On its website, users can play "over 200 industry favorite games by the most reputable providers," including slot games, scratch cards, poker, and other table games such as blackjack and roulette (the "Chance Games").

1

7. The Chance Games are games of chance. In fact, Stake admitted such on its website, boasting about "a chance to win big along side [sic] Drake."[1]

8. Stake offers prizes, such as cash or cash-equivalent gift cards, to online participants who wager money to play the Chance Games.

9. Even then, as further alleged below, free play doesn't offer the prizes that attract Ohio residents, including Plaintiff, to Stake. Instead, Ohio residents, including Plaintiff, access Stake to win prizes, just as Stake intends. And the only way to win prizes is with Stake Cash.

10. Nonetheless, the Ohio courts have long held that the availability of free chances is not necessarily dispositive of whether the game is a gambling scheme. *Freedom Concepts, Inc. v. Ohio Liquor Control Comm'n,* 2003-Ohio-4686 (holding that a free game did not change the fact that the player was paying for a chance to win a prize, making the machine a gambling device).

11. Since Stake requires participants to submit consideration for a chance to win a prize, it is an illegal gambling operation in Ohio.

12. Further proof that Stake accepts payments to play is the "Monthly Budget Calculator" tool on its website so players can learn their "Disposable income" to purchase more "Gold Coins" and "Stake Cash."

13. The legality of Stake is not in question in states like Ohio with strict gambling laws.

14. Plaintiff wagered money or other things of value on Stake.us and lost.

15. Moreover, Stake engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Ohio, including causing Plaintiff to believe Stake was approved and certified by the State of Ohio when in fact it is illegal gambling.

## II. THE PARTIES

16. Plaintiff Carey Jones is domiciled in Ohio and a resident of Georgetown, Ohio. Plaintiff wagered and lost money on Defendant's illegal gambling. As a result, he suffered an injury in fact resulting in the loss of money and/or property that is recoverable in Ohio. Plaintiff

---

[1] https://stake.us/drake

2

did not know Stake was illegal gambling in Ohio. Based on Stake's advertising and website, Plaintiff thought that Stake had the approval and certification of the State of Ohio, among other things. Had he known the truth, he would not have participated in online gambling on Stake.us.

17. Defendant Sweepsteaks Limited is a for-profit business entity registered in Cyprus and with its registered office at 28 Oktovriou, 313 Omrania BLD, Limassol, Cyprus. Defendant also operates a U.S. office at 13101 Preston Rd., Ste 110-5027, Dallas, TX 75240. Defendant owns and operates Stake.us. Through its website, Defendant conducts business in Ohio, including this District. Stake is not registered to do business in Ohio.

## III.    JURISDICTION AND VENUE

18. This Court has diversity jurisdiction over this action because Plaintiff's gambling losses exceed the jurisdictional minimum under 28 U.S.C. §§ 1332(a).

19. Venue is proper in this District under 28 U.S.C. § 1391 because Stake is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, Plaintiff wagered and lost money on Stake.us in this District, and Stake has marketed and advertised its website in this District, made its website accessible in this District, accepted wagers in this District, and paid out prizes in this District, among other things. Thus, a substantial part of the events or omissions giving rise to the claim occurred within this District.

20. This Court has personal jurisdiction over Plaintiff because Plaintiff resides in Ohio and consents to the jurisdiction of the Court.

21. This Court has personal jurisdiction over Stake because Stake, at all times relevant hereto, has systematically and continually conducted, and continues to conduct, business in this State, and this lawsuit arises out of those contacts with Ohio.

22. Specifically, Stake is an interactive website used for commercial purposes – specifically, gambling.

23. It was foreseeable and intended that Ohio residents would use Stake.us because Defendant knew that Ohio residents frequently gamble on the website and that they would continue to do so.

3

24. Defendants know that Ohio residents use the website because it asks users to disclose which state they live in when registering to use the website.

25. In fact, Stake encouraged it by not listing Ohio as an excluded territory.

26. Stake also advertises to Ohio residents in Ohio, and emails Ohio residents about games and other offers it seeks to promote or the status of their accounts and transactions.

27. In other words, Stake reached into Ohio and invited its customers to participate on its website.

28. Stake appeals to, and profits from, an audience in Ohio, and Ohio residents form a significant portion of the website's customer base and revenue.

29. Stake also collects information and data about Ohio residents.

30. Stake took steps to ensure that Ohio residents would have access to the website so that they could gamble online.

31. Specifically, there is widely available technology that allows websites to detect the location of a website visitor, including the state in which they are located. Reputable online gambling companies utilize this technology to prevent website users from using their websites if the website user is located in a state where online gambling is illegal, like Ohio.

32. Stake made an affirmative decision to not use that technology for Stake.us, because that would prevent Defendant from profiting from gambling in Ohio.

## IV. THE PROBLEM OF ONLINE GAMBLING

33. The online gambling industry is profiting from gambling addiction the same way the Sackler family once profited from opioids.

34. For decades, the proportion of Americans diagnosed with pathological gambling held steady at less than 1 percent, with 7 million Americans believed to be suffering from a gambling addiction at an annual "social cost" of $7 billion.  But those numbers have skyrocketed with the advent of online gambling: from 2021 to 2022, there was a 45 percent increase in the number of calls, texts, and messages to the National Problem Gambling Helpline. According to

4

one study, up to 30 percent of problem gamblers have attempted suicide, while a larger percentage of such individuals reported having suicidal ideations.

35. The United States may be on the cusp of an explosive growth of gambling addiction akin to the opioid crisis, fueled by online access to gambling websites. Gambling disorder can take as long as five to seven years to develop. During the last five to seven years, online gambling websites proliferated with no way to reduce the ensuing harm. The federal government spends no money on gambling addiction programs, and state gaming commissions regulate gambling unevenly, at best.

36. The fallout is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers.

37. Online gambling addiction also has massive social consequences, resulting in the drain on state government funds to address addiction, the rise in teenage online gambling addiction, and the rise in crime associated with online gambling addiction.

38. This rise also includes a relatively new phenomenon: gambling addiction among minors under the age of 18. Whereas brick-and-mortar casinos could take steps to exclude minors, the easy access to online gambling has made it easier for underage minors to participate in gambling. Websites like Stake.us are designed to attract adolescents as well as adults and are causing a sharp rise in online gambling addiction among minors.

39. Treating online gambling addiction poses challenges that are different from other forms of addiction. For an individual with substance use disorder, safety measures like disposing of all alcohol or drug paraphernalia or avoiding triggering social events are key to treatment. Things are not so clear-cut when treating digital gambling because for most people, mobile devices have become a necessity of life. So, it's not a question of avoiding the drive to the casino, but instead, a constant struggle to avoid the temptation to gamble from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive a signal. Furthermore, unlike the billions of dollars of federal funding dedicated to alcohol, tobacco

5

and drug addiction programs, there are no federal funds allocated to support problem gambling services.

40. To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like Stake.us are unlicensed and unregulated. As one gambling treatment provider warned, "[u]nregulated platforms [like Stake.us] can pose significant risks for players struggling with gambling addiction. The lack of proper safeguards often exacerbates financial and emotional stress, making it harder for individuals to regain control."

41. For example, Stake accepts credit cards to pay for gambling on its website, in violation of the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367. As a result, people have racked up massive debt gambling on Stake.us.

42. The bottom line is that Stake lets people play online casino games and wager real money while defying this state's constitutional prohibition against gambling, offering inadequate player protections, exploiting adolescents, and siphoning revenue from this state.

43. In Ohio, it is illegal to operate and offer unlicensed, unregistered, and unapproved online gambling casinos, including websites that offer slot machines, blackjack, roulette, and poker. In this regard, Ohio has a fundamental and deep-rooted public policy against gambling.

## V. DEFENDANT STAKE OPERATES A GAMBLING WEBSITE

44. Defendant Stake owns and operates a popular, casino-oriented internet gaming website called www.Stake.us.

45. Stake began as a project in 2013 to create on online cryptocurrency dice game called "Primedice." Court documents in litigation between the founders reveal that when the project was being developed, the founders freely referred to the website as "gambling," and knew there were "potential criminal and tax issues" with the concept but proceeded anyway.

46. The project eventually "evolved" into Stake.com—aka "Stake.us." in the United States.

47.     While Stake's new website was in development, its CEO Edward Craven publicly touted Stake as "a massive project" that "**pretty much covers all aspects of gambling**."

48.     Today, Stake.us is a thriving illegal gambling operation that offers various online casino games, such as slot games, scratch cards, poker, and other table games such as blackjack and roulette (i.e., the Chance Games).

49.     The website also offers a "live casino" where online players interact directly with live dealers visible via a webcam to play games like blackjack and roulette:



50.     Stake relies heavily on Instagram and other social media for advertising, often bolstered with celebrity endorsements from Canadian rapper, Drake.  The Instagram profile for the European version of Defendant's website, called Stake.com, describes it as the "World's Leading Betting Platform."

7



51.     On Stake's U.S. and European Instagram channels, Stake constantly refers to "gambling," such as the promotion with Drake shown below, describing "The First Gambling Stream of 2025" and the others showing roulette and card tables.





52.     Gambling has been good to Stake and its founders. Stake's websites now handle over 4% of all Bitcoin transactions in the world, a figure that is staggering when considering the total size of the cryptocurrency economy. Stake processes $219 billion in Bitcoin transactions annually, an amount that far exceeds the financial turnover of many legitimate financial institutions.

53.     Online gambling websites like Stake.us are fueling a steep rise in online gambling addiction, due in part to the easy access to gambling from any place with an Internet connection. Internet forums are awash with stories of people struggling with online gambling addiction generally, and Stake.us specifically. The troubles they describe—massive losses, relationship troubles, suicidal thoughts—are age-old stories in the context of gambling.

54.     Defendant's website includes a webpage warning users to monitor for signs of gambling addiction, and provides a link to gambling addiction organizations like Gaming Addicts Anonymous and the Financial Counseling Association of America. And yet at the same time, Stake gaslights its users, including vulnerable populations like minors and people struggling with gambling disorder, by claiming that the operation is a "legal sweepstakes" and does not involve "real money gambling."  Stake's claims that it offers a "legal sweepstakes" is a sham.

55.     In short, Chance Games offered on the website are gambling, and they are no different than if they were played in a Las Vegas casino.

56.     The website is accessible and made available to Ohio residents.

## VI.     STAKE HAS MASSIVELY SCALED UP AN OLD GIMMICK THAT CRIMINALS ONCE TRIED TO USE TO EVADE GAMBLING LAWS

57.     Stake will ask the Court to disbelieve its own eyes and conclude that Stake.us is not really a gambling operation, but instead offers legal "sweepstakes." That is an old gimmick that was once popular among criminals in the early 2000s.

58.     As detailed below, courts and law enforcement agencies consistently determined that the same business model Stake utilizes today is a pretext for illegal gambling.

59.     A federal district court has already held on summary judgment that one of Stake's competitors that operates materially the same way is an illegal gambling operation. *See Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024).

### A.     The Internet Café "Sweepstakes" Crime Trend Of The Early 2000's

60. The early 2000s saw a nationwide crime trend where criminals attempted to evade gambling laws by offering gambling at so-called "Internet cafés." These operations—often located in suburban strip malls— "promoted" the sale of products such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers. When customers purchased the product, they received a corresponding number of "sweepstakes" points for each dollar spent. Customers then used those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés.

61. Most states' gambling laws require three elements: prize, chance, and consideration. By artificially separating the consideration from the chance to win real money, criminals believed that they could evade state gambling laws, while claiming that the activities were no different from the sweepstakes promotions offered by Publisher's Clearing House and McDonalds.

62. Courts and state law enforcement officials in the United States repeatedly determined that such tactics were an obvious pretext and cover for illegal gambling.

63. For example, the Arkansas Supreme Court found that vending machines offering games of chance through promotional sweepstakes, even when paired with the purchase of a nominal item, amounted to illegal gambling devices under Ark. Code Ann. § 5-66-104. *Pre-Paid Solutions, Inc. v. City of Little Rock*, 343 Ark. 317, 34 S.W.3d 360 (2001). Crucially, the sweepstakes format, where participants risk property for the opportunity to win additional rewards, meets the statutory definition of gambling under Ohio law. This precedent establishes that sweepstakes schemes designed to circumvent gambling laws are nevertheless unlawful, thereby supporting the claims against Stake and similar operations.

64. In Mississippi, an individual was convicted of racketeering and gambling charges in connection with an Internet café where—like here—customers could play simulated games that resembled gambling programs, such as slot machines, keno, and poker. *Moore v. State,* 309 So. 3d 7, 9 (Miss. Ct. App. 2020). Customers needed a "sweepstakes" code to play the game, but

customers could not purchase a sweepstakes code outright. Instead, customers received sweepstakes codes by purchasing something else in the store, such as food or phone minutes.

65. The Alabama Supreme Court addressed the issue directly in *Barber v. Jefferson Cty. Racing Ass'n, Inc.,* 960 So.2d 599, 602-605 (2006), where the owners opened an "[I]nternet café" that offered a continuous "sweepstakes promotion" whereby customers could receive 100 entries for each dollar spent on computer access and Internet time. The Alabama Supreme Court rejected every argument for why this gimmick was not gambling—including the argument that there was "no consideration" for the entries because people were only buying Internet time, and because people had the option to obtain free chances by mail without purchasing Internet time. *See id*. at 612.

66. The outcome in *Barber* is consistent with the view taken by courts and law enforcement agencies across the country.

67. In 2015, the California Supreme Court addressed Internet café gambling in *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015), where the defendant sold Internet time on computer terminals. The defendant promoted the sale of Internet time and other products with a "sweepstakes" giveaway, wherein the defendant provided 100 "sweepstakes points" for each dollar spent, which could then be used to play games of chance. The defendants denied that the operation involved gambling because they were supposedly only selling computer time, and that the sweepstakes games were "not gambling" but instead a "promotional game."  The Kern County District Attorney obtained a civil injunction for violations of California's gambling laws, and that injunction was affirmed on appeal.

68. In 2011, three individuals—including a Fall River, Massachusetts City Counsil member—were indicted and charged with various gaming charges in connection with the operation of two Internet cafés in Massachusetts.  The defendants unsuccessfully argued that players were only paying for Internet time and that any gambling that occurred involved legitimate sweepstakes offers.  The Massachusetts Attorney General stated unequivocally that this conduct constituted illegal gambling.

69. The Ohio Court of Appeals said it best when rejecting a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731 (2013): "**the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance**." The court added, "there is no justification for ignoring the nature of the transaction simply because the system is designed in such a way as to artificially isolate one part of the illegal transaction from another. The justice system is not so blinded by chicanery."

### B.     Stake Is An Online Version Of An Internet Café

70. Like the criminal Internet cafés in operation a decade ago, Defendant here attempts to separate the element of consideration from gambling by offering a two-tiered system of virtual coins, both of which function like casino chips.

71. The first type of virtual currency, called "Gold Coins," can be used to play the casino games in "Standard Play" mode with no potential to win money. When using Gold Coins, a player can only win or lose Gold Coins. However, for the most part, people only go to Stake.us to engage in real-money gambling, so those Gold Coins are largely ignored.

72. The second type of virtual currency—called "Stake Cash"—can be used to play the same casino-style games in a "Promotional Play" mode, where they carry real monetary value and can be redeemed for cryptocurrency. To get Stake Cash, players typically must purchase them in a package with Gold Coins. Stake pretends that the "Stake Cash" is a "free" bonus added to the sale of Gold Coins, but as shown above, that is the same tactic Internet café owners unsuccessfully argued before when trying to artificially separate the element of consideration from the other elements of gambling.

73. There are two other problems with the notion that Stake Cash is just a "free" add-on bonus to the Gold Coins.

74. First, as noted above, most people ignore the Gold Coins after buying them.

12

75. Second, and more importantly, Stake Cash is a proxy for real money. Depending on the package bought, there is nearly 1:1 correlation between the number of dollars spent and the amount of Stake Cash provided in each purchase. If someone spends $20 dollars ostensibly to by Gold Coins, they get 20.05 Stake Cash Coins to use for gambling; whereas if they spend $50, they will get 50.12 Stake Cash Coins, and so on:[2]



76. Likewise, Stake Cash is redeemable on a 1:1 basis.

77. The $9,000 per day "maximum buy" underscores the large amounts of money being gambled on Stake.us. Nobody spends $9,000 a day just to play video games.

---

[2] Although Defendant offers a few Gold Coin packages that do not include Stake Cash, that is for show. Only a tiny fraction of website users, if any at all, purchase those packages because they do not allow users to engage in the primary purpose of the website, which is real-money gambling.

78.     There are several other factors that show that the true purpose of Defendant's website is gambling, and that like the Internet cafés that preceded the launch of Defendant's website, the use of the term "sweepstakes" is a pretext for gambling.

79.     First, the casino-like atmosphere and imagery associated with the website is evidence that the true purpose of the website is to promote gambling, as opposed to a sweepstakes promotion of some other good or service.

80.     Second, the duration of the "sweepstakes" promotion also demonstrates that the true purpose of the website is not to promote a bona fide consumer good or service, but instead gambling. A traditional sweepstakes promotion is a limited term event designed to attract consumer attention to a product or business, and ordinarily expires after a few weeks or months. In contrast, Defendant's purported "sweepstakes," runs perpetually.

81.     Third, the typical payout percentage for a temporary promotional sweepstakes is a small percentage of revenue earned by the company. For example, the typical grand prize for McDonald's annual Monopoly-themed sweepstakes is usually about $1 million, which is a tiny fraction of the *billions* of dollars McDonald's earns each year.  By contrast, casinos typically pay out between 80-96 percent of their revenues (sometimes referred to as the "return to player" or "RTP").  Defendant claims that the RTP on its games generally ranges from 96-98%.

82.     Fourth, conditions designed to keep customers playing longer are indicative that the true purpose of the website is to keep them gambling, rather than a true sweepstakes aimed at promoting a product or service. Unlike traditional sweepstakes games where prizes can be claimed immediately, Defendant imposes restrictions on prize redemption that can cause website visitors to play longer. Specifically, website visitors must have at least 5,000 Stake Cash to obtain gift cards and obtain cash. This forces consumers to continue gambling and eventually lose their balance.

83.     Fifth, most if not all users of the website largely ignore their ample supply of Gold Coins in favor of playing with Stake Cash, which is a clear indication that Stake Cash, and not the supposedly promoted product (Gold Coins), are the primary subject of the transaction.

84.     In short, Defendant is copying the Internet café playbook, but instead of selling Internet time, long-distance phone minutes, or small groceries coupled with supposedly "free" sweepstakes tokens, Defendant sells Gold Coins, which are then ignored so that players can use the Stake Cash for cryptocurrency gambling. The owners of a competitor gambling website that operates the same way as Stake.us in all material respects, called ChumbaCasino.com, publicly admitted in a securities filing that social casino gaming websites like Stake.us are modeled after illegal Internet cafés:

> 67  Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.

> 68  Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

85.     The prospectus also explains how, at the time, "Internet sweepstakes Cafes are reported to have turned over $10bn (€9.4bn) in 2015, with over 5,000 now operating in 12 states" (*id.* at 69) and described the "significant opportunity" of adopting the "sweepstakes café model." *Id.* at 95-96.

86.     In sum, the parallels between Defendant's website and the Internet sweepstakes café business model—which courts have held are incontestably gambling—are clear:

- ✓ Both sell a "product" that comes with a commensurate number of "free" sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting. Instead of the cafés selling a "prepaid phone card," Defendant sells a virtual gold coin.

- ✓ Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald's monopoly sweepstakes.

✓ Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.

✓ Both offer several ways to get free entries without requiring a product purchase, such as by mailing a postcard to a designated P.O. Box address, although the number of free entries awarded through this method is a very low amount, if anything at all.

87. Moreover, Stake does not offer free-play tokens at stores or other locations across the state of Ohio.

88. Stake does not operate for a fixed duration to promote or market a product or service, Stake.us operates indefinitely and *is* the product or service.

**C.**    **Stake Misleads The Public With False Claims Of Legality**

89. Stake also engages in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce by misleading and causing confusion that participation on Stake.us is legal in Ohio.

90. In its terms and conditions, Stake states:

any country other than the continental United States of America and Hawaii ("US"); Washington, New York, Nevada, Idaho, Kentucky, Michigan, Vermont, New Jersey, Delaware, West Virgina, Pennsylvania, Rhode Island, Connecticut, and any other states or jurisdictions which, under the laws applicable to you, are legally precluded from playing the games offered on the Platform, and any other jurisdiction Stake excludes, in its sole discretion, from time to time.

91. Stake does not include Ohio as an excluded territory, although online gambling in any form is strictly prohibited by the State of Ohio.

**VII. ALL PURPORTED CONTRACTS WITH STAKE NEVER EXISTED, INCLUDING THE PURPORTED ARBITRATION PROVISION AND ITS DELEGATION CLAUSE**

92. The only consideration paid by Plaintiff was wagers to gamble.

93. In Ohio, "[a]ll promises, agreements, notes, bills, bonds, or other contracts, mortgages, or other securities, when the whole or part of the consideration thereof is for money or other valuable thing won or lost, laid, staked, or betted at or upon a game of any kind, or upon a horse race or cockfights, sport or pastime, or on a wager, or for the repayment of money lent or

advanced at the time of a game, play, or wager, for the purpose of being laid, betted, staked, or wagered, are void."

94. Thus, no contract was ever formed between the parties, and any purported contract between himself and Defendant, and any contractually based defenses Defendant may raise are likewise void.

95. Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

96. Plaintiff had no opportunity to negotiate the contract terms, and the terms never changed for Plaintiff.

97. Plaintiff had *zero* bargaining power.

98. Plaintiff could not have used Stake.us unless they agreed to the terms and conditions, and they could not have obtained comparable products or services unless they agreed to arbitrate.

99. The terms and conditions are not easily accessible, and the arbitration clause is not conspicuous. Instead, it is buried in a sea of font, in the same color and same type, not bold or in capital letters, and doesn't require an independent signature or acknowledgement.

100. The terms and conditions also unconscionably limit Plaintiff's damages, and do not afford them an opportunity to select or have a say in the arbitrator(s).

101. Moreover, the scope of the arbitration agreement is too large, covering every single claim against every single party, known or unknown.

102. The inclusion of a class action waiver is also unconscionable as the only practical effect is to chill or prevent claims, affording Stake immunity.

103. Moreover, the expenses and forum are unfair and unconscionable, as the cost to pursue individual arbitration likely exceeds the reward, further chilling and preventing claims and affording Stake immunity.

104. In sum, Plaintiff paid to forgo everything – inability to protect their statutory and constitutional rights – and Stake gains immunity at no cost. Plaintiff was not given a *quid pro quo* for agreeing to arbitrate and forgoing their constitutional right to a trial by jury.

105. Moreover, Plaintiff was fraudulently induced into entering these contracts. Stake misrepresented that Stake.us was legal in Ohio, on which Plaintiff relied. Had Stake disclosed the truth that Stake.us is not legal in Ohio, Plaintiff would not have entered into the contract with Stake.

106. Finally, the contract is illusory, since Stake reserves the right to change the terms at any time without prior notice.

## VIII.  CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**28 U.S.C. §§2201 *et seq*.**

107. Plaintiff incorporates by reference the allegations contained in the above paragraphs.

108. Ohio law heavily regulates and outlaws most forms of gambling.

109. In Ohio, gambling is defined as "hazarding of anything of value upon the result of an event, undertaking, or contingency, but does not include a bona fide business risk."

110. In Ohio, a game is chance-based, not skill-based, when more chance is involved in the outcome than skill.

111. Stake operates an illegal gambling website (Stake.us) wherein participants pay consideration for the chance to win a prize.

112. The Chance Games offered by Stake are predominantly games of chance and do not involve any level of skill.

113. The prizes Stake offers are valuable and can be used as or converted into US currency.

114. Stake operates an online casino, not a sweepstakes. In Ohio, even though the player is assured of his money's worth of some commodity and hence cannot lose, it is still illegal

gambling. In fact, even paying back up to 98% of all money played is illegal gambling (where the typical sweepstakes payout is 50%). And the duration of traditional sweepstakes is limited, not indefinite, like Stake.us. And just because Plaintiff can play for free does not save Stake.us. The Ohio courts have long held that the availability of free chances is not necessarily dispositive of whether the game is a gambling scheme: *Freedom Concepts, Inc. v. Ohio Liquor Control Comm'n*, 2003-Ohio-4686 (holding that a free game did not change the fact that the player was paying for a chance to win a prize, making the machine a gambling device). Moreover, Stake does not promote or market a good or service, it is the good or service. And Stake does not offer any free-play tokens available at any location in Ohio.

115. Plaintiff paid money or other things of value to Stake to play the Chance Games for the sole purpose of winning a prize (gift cards or cryptocurrency).

116. Plaintiff seeks an order declaring that (1) Stake.us is illegal gambling in Ohio and (2) any authority under which it purports to operate is unconstitutional, as well as a permanent injunction enjoining Stake from operating Stake.us in Ohio, with disgorgement of profits.

117. Plaintiff seeks a speedy declaratory judgment hearing pursuant to Fed. R. Civ P. 57.

**SECOND CAUSE OF ACTION**
**OHIO GAMBLING LOSS RECOVERY STATUTE**
**Ohio Rev. Code Ann § 3763.02, *et seq.***

118. Plaintiff incorporates by reference the allegations contained in the above paragraphs.

119. Plaintiff is an Ohio residents who paid and lost money or other things of value on Stake.us or are the spouse, child, or next of kin of an Ohio resident who paid and lost money or other things of value on Stake.us.

120. Stake operates an illegal gambling website that is accessible in Ohio.

121. Plaintiff paid and lost money or other things of value to Stake on Stake.us.

122. Plaintiff demands recovery of the money or other things of value paid and lost to Stake on Stake.us in an amount to be determined at trial, including interest.

19

123. Plaintiff also seeks recovery of money or other things paid and lost on Stake.us on behalf of the spouses, children, and next of kin of the losers.

124. Plaintiff also seek an order declaring that (1) Stake.us is illegal gambling in Ohio and (2) any authority under which it purports to operate is unconstitutional, as well as a permanent injunction enjoining Stake from operating Stake.us in Ohio, with disgorgement of profits.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**OHIO REV. CODE ANN 1345.01, *et seq.***

125. Plaintiff incorporates by reference the allegations contained in the above paragraphs.

126. Plaintiff brings this count individually pursuant to Ohio Rev. Code Ann. § 1345.01.

127. Defendant and Plaintiff are "persons" within the meaning of Ohio Rev. Code Ann. § 1345.01.

128. Plaintiff is a "consumer" and their use of the change games on Stake.us are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01.

129. The Ohio Consumers Sales Practices Act (CSPA), Ohio Rev. Code Ann. § 1345.02 prohibits unfair or deceptive acts or practices in connection with consumer transactions, such as those described herein.

130. The CSPA also provides a non-exhaustive list of unconscionable acts or practices, including but not limited to:

    a. Representing "the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have." Ohio Rev. Code Ann. § 1345.02(B)(1)

    b. Representing "the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02(B)(2).

    c. Advertising "[t]hat the subject of a consumer transaction is available to the consumer for a reason that does not exist." Ohio Rev. Code Ann. § 1345.02(B)(4);

d. Representing "the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not." Ohio Rev. Code Ann. § 1345.02(B)(5); and

e. Representing "the supplier has a sponsorship, approval, or affiliation that the supplier does not have." Ohio Rev. Code Ann. § 1345.02(B)(9).

131. As alleged herein, Defendant violated CPSA by engaging in unfair and deceptive trade practices.

132. Namely, Defendant misrepresented or caused confusion or misunderstanding that gambling on Stake.us is legal and approved or certified by the State, when in fact it is illegal gambling in Ohio.

133. Defendant further violated the CSPA by representing that the goods or services are of a particular standard and legal in Ohio, when in fact gambling is illegal in Ohio.

134. Defendant further violated the CSPA by representing, implying, and/or failing to disclose that its goods or services are illegal in Ohio, which is an unconscionable, false, misleading, and/or deceptive act and/or business practice.

135. Other unconscionable, false, misleading, and/or deceptive act and/or business practice employed by Defendant include:

a. deceiving or confusing customers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winnings and the obligation to pay for losses), when in fact any such rights, remedies, or obligations are prohibited by law; and

b. representing that the website users will receive an economic benefit (in the form of gambling winnings), when the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction (i.e., winning the bet).

136. To the extent required by law, Defendant owed a duty to Plaintiff because disclosure that participation on its website is illegal was necessary to dispel misleading impressions that participation on Defendant's website was legal.

21

137. Defendant's unfair or deceptive acts or practices were likely to, and did, in fact, deceive Plaintiff about the true approval, certification, and legality of its goods or services.

138. Defendant's violations present a continuing risk to Plaintiff, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

139. Defendant acted with knowledge and intent to deceive.

140. Plaintiff suffered ascertainable losses and actual damages as a direct result of Defendant's conduct. Plaintiff would not have participated on Stake.us had Defendant disclosed the true nature of Stake.us.

141. Ohio courts and the attorney general have deemed other sweepstakes that operate like Defendant to be illegal and violative of the CSPA:

   a. In *State ex rel. Celebrezze v. Howard*, 77 Ohio App. 3d 387, 393, 602 N.E.2d 665, 669 (1991) the court held that anything "categorized as gambling or an award by chance" "plac[es] it squarely within the CSPA." *See also* PIF No. 10001056; *State ex rel. Montgomery v. Purchase Plus Buyer's Grp., Inc*., 2002-Ohio-2014.

   b. The attorney general has also deemed sweepstakes or prize contests illegal unless they, among other things, "promote the sale of a bona fide good or service." PIF No. 10001626.

142. Pursuant to Ohio Rev. Code Ann § 1345.09, Plaintiff seek an order enjoining Defendant's unfair and/or deceptive acts or practices and awarding damages (actual or statutory, whichever is greater), including punitive damages, and any other just and proper relief available under the CSPA.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

A. Declaring that Stake.us is illegal gambling in Ohio and that any authority under which it purports to operate is not Constitutional;

B.     Enter a permanent injunction permanently enjoining Defendant from operating Stake.us in Ohio;

C.     Ordering Defendant to refund all wages lost by Plaintiff and pay actual and statutory damages (including punitive damages) and restitution and disgorgement of profits to Plaintiff, as allowable by law;

D.     Ordering Defendant to pay both pre- and post-judgment interest on any amount awarded;

E.     Ordering Defendant to pay attorneys' fees and costs of suit; and

F.     Ordering such other and further relief as the Court may deem just, equitable, and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  April 24, 2026

*/s/ Alyson Steele Beridon*
Alyson Steele Beridon (0087496)
Trial Attorney
**HERZFELD SUETHOLZ GASTEL
LENISKI AND WALL, PLLC**
600 Vine Street, Ste. 2720
Cincinnati, OH 45202
Telephone: (513) 381-2224
alyson@hsglawgroup.com

Benjamin A. Gastel (TN #28699)*
**HERZFELD SUETHOLZ GASTEL
LENISKI AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
ben@hsglawgroup.com

*Lead Attorneys for Plaintiff*

*\*Pro Hac Vice forthcoming*

23